For the record, this is In Re Applicationof Chevron Corp 10-4699, and the purpose we're here today to deal with the motion and responses that were filed just prior to Christmas. I understand that what we'll have is counsel for the plaintiffs first, is that Mr. Terrell? Yes, Your Honor. And then we'll have counsel for Chevron and Mr. Vinegard? Yes, Your Honor, and Mr. Mastra. Okay, Mastra. Okay, gotcha. And Alan Vinegrad for Mr. Dago. Okay. Andres Rivera for Mr. Perez-Perez. Okay. Why don't we, there's no time set, so we're just going to deal with it in order to get the issues out of the way, so why don't you begin, Mr. Terrell? May it please the Court, for the record, my name is James Terrell from the firm of Patton Boggs, and I argue today on behalf of the Lago Agrio Plaintiffs. It is important to understand the context in which we ask this Court to maintain in place the stay that was entered before Christmas. As a result of the District Court's order, all... What's the status of what was to have occurred today? Has that been postponed? Postponed indefinitely. And that relates to Mr. Pilares and Mr. Vega? Yes, Your Honor. Indefinitely, so it's not postponed to the 7th? No, it's postponed indefinitely. There is no new date. When you say indefinitely, indefinitely can mean, like somebody said, that's, you know, it can mean like far in the future, or it can mean, simply mean, well, the date hasn't been set, you know, so it's indefinite. And I don't know the answer. What's that? I don't know the answer, Your Honor. You don't know the answer. We do not have... You don't know until when. Could be soon, could be later. That's correct, Your Honor. I don't know the answer. It was adjourned, I think, by way of full answer to your question. In the proceedings in New York, my clients were asked to publicly state, which we did, that we had no opposition whatsoever to the adjournment of the criminal proceedings respecting the individuals. The Republic of Ecuador went to its client, the Attorney General of Ecuador, and asked if the Attorney General would go to the Prosecutor General, who under Ecuadorian procedure is the Chief Prosecutor, and decides the schedules and requests that an adjournment take place. We don't know what happened in the interim. We only know that the hearing was canceled and that there is no new hearing. Coming back to context, if I may. So, is that a reason that what you're saying there is the... Any purported need for urgency doesn't exist as much as the other side claims? Is that... We will certainly argue that, Your Honor. Certainly, there is time for the District Court to do what we believe it should have done. A careful review of the lengthy privilege log to determine whether or not there should be subject matter waiver as to every single document on that log. How many would that be? I'm sorry, how many? I have not prepared or know the privilege log, but the privilege log is 833 pages. If you assume there's 20 or 25 entries per page, it's in the thousands. Well, I'm glad my original appointment to the Federal Court was to the Court of Appeals. Back to context. As a consequence of the District Court's decision, all privilege documents of all attorneys who have worked on this matter, who are in the past, currently, and indeed in the future, have to be turned over to Chevron. By way of contrast, Chevron is under no obligation, notwithstanding, believe them or not, the charges made against its employees to turn over any of its privileged material whatsoever. This occurs at a time 17 years into a legal battle when the court in Ecuador, sometime in 2011, is expected to render a final decision. Why does it happen? It happens because the District Court concludes that Mr. Cohen, a very well-known lawyer from Philadelphia, that his brief appearance in a documentary film resulted in a total subject matter waiver of all of my client's, not Mr. Cohen's, my client's privileges over a 17-year period. The District Court reaches... How lengthy was that appearance? You said... There are five excerpts that are referred to. I haven't seen them all. Are these in the film or the outtakes? It's in the outtakes, is my understanding. There may be something in the film, I'm not positive. If it's in the film, it's extraordinarily brief. In the outtakes, there are only five. Five are identified. I would say, you know, minutes. We're talking minutes, not hours. But how many outtakes? Five were referred to in the District Court's opinion. All right. The District Court, I submit, reaches this conclusion without any evidence that a single privileged document was submitted to or used in the judicial proceeding in Ecuador. Therefore, impossible to create an intrajudicial effect. And I'm going to focus on that in my argument. I submit to you in the broader contest that Section 1782, which is a limited device to gain discovery to aid in a foreign proceeding, was never intended to allow federal courts to tip the scales of justice in favor of American defendants in foreign courts. Especially when that American defendant rejected an American court in the Southern District of New York and specifically asked, after nine years of forum nonconvenience litigation, to have its case heard in Ecuador. It is that... The thing that's going on here is, I mean, you've got a very experienced, bright, savvy, street-smart district judge and something has caused him to say, look, this is so blatant. And I looked at some of the things that, you know, he's referring to the meeting in the offices of KSG, where Cohn and Donziger and other attorneys from the Lago Agrio plant have discussed the financing of the litigation, a meeting at which they discussed the Cabrera report, and it goes on and on. And I guess he ultimately came to the conclusion, this is just a total waiver. I mean, attorney-client privilege is you don't talk with third parties, and here you've got stuff where people are filming what would ordinarily be considered to be privilege. It is my understanding that... And I realize I'm touching on the merits... No, no, but that... I'm just trying to figure out why... I mean, this is not a judge who flies by the seat of his pants normally, at all, and very careful. And in this case, he thought he'd just seen enough. The context in which he made this decision is one that I'm not happy about, but it's there. There's 17 different federal courts in this country that have been asked by Chevron to deal with these issues. Some have gone one way, some have gone another way. Some have decided maybe there's a basis for crime fraud, we'll talk about that later. Some have said there's no basis for crime fraud. Judge Kaplan, in the Southern District of New York, has been most vocal. He was shocked and dismayed by Mr. Donziger, not Mr. Collins, Mr. Donziger's level of appearance, and frankly, the things that he said that, trained as a defense lawyer all my life, I would never have said, and he was shocked by that. And to some extent, he was also faced... Well, the New York Times reported on some of those. Absolutely, and he was faced with a January 5 deadline urged by the criminal plaintiffs who said their lives were in jeopardy, and he was faced between two very tough choices. One choice was go through the normal procedure that you should go through to analyze whether there was really waiver or whether subject matter waiver should occur, but that would be very time-consuming with 15, 17 years of documents numbering more than 50,000, or decide what was decided there. I think our judge here was affected by the same thing. He looked at these outtakes. He said, no lawyer should be doing this. This is not what lawyers do. Privileges are something that's sacrosanct and that's maintained. What I suggest that maybe he overlooks is that this is the first time I've ever lived in this world. I'm not a cause lawyer. I don't go into jungles. My most recent six years has been spent as chief counsel for the city of New York on all 9-11 cases before Judge Hellerstein. But it's a different world for people who fight someone like Chevron, who have to go into the jungles, who have to drive public opinion as well to bring pressure. My reading of the most recent decisions of our ethics authorities say that's part of the responsibility. I'm not saying how he did it, but you have an obligation to represent your client, including getting his story out there. Now, I think this judge, who I think is, I don't know him well, but everything I know about him, is careful, was led to make some fundamental errors that I will discuss because he was appalled at the extent to which Mr. Donziger and to a much lesser extent Mr. Cohen said ridiculous things in these outtakes and allowed this crude documentary to come and follow him around for years. You pose this case as if the application made here is only in connection with the pending criminal charges against the two Chevron attorneys in Ecuador, but I thought they also wanted the documents with respect to the damages assessed by the Cabrera. They want all three and the arbitration, and I'm going to talk about all three. In other words, they didn't want it just for the criminal case. No, but the timing was most tight on the criminal cases, and what drove, because I argued this before the Second Circuit, and if you read the Second Circuit's opinion, they were disturbed. They had to look at a judge, who also has a reputation for being a good jurist and very careful, and look at my argument, which essentially said, I've now been brought in, filed my first notice of appearance in November, to do two things. To try to see that a judgment that will command international respect is in Ecuador, is entered in Ecuador. If I have to try to work to clean anything up, I'm going to try to do it. And then, if that judgment is rendered in favor of my clients, to try to seek international enforcement, because in the intervening 17 years, Chevron has stripped Ecuador of its assets. It is in that context that it's taken its assets out of Ecuador. It's made itself judgment-proof. It's all assets. It sounded like you were saying that they stripped the country of the country's assets. What you're saying is they blew town. They blew town with their money. Exactly. In the end, if we were to continue to stay, how expedited could we make this? As expedited as you want it to be made. I mean, it would take a couple of weeks to write the merits brief, but I don't think anything more than that. And it would be in pari materia, in what you decided, in admittedly a different issue. But in the case that arose from, I believe, the District of New Jersey, that's also before this panel, in which you have set a schedule. It's now, I believe, under consideration by the panel. But you allowed a couple of weeks for merits briefs to occur. If something happens in the interim now, and that criminal proceeding gets reset, I am sure my friends from Chevron will be quickly back here to suggest that you alter the schedule. And candidly, I won't oppose that. Okay? But to allow a couple of weeks for this merits briefing to take place before all the rest of the documents are turned over to Chevron, and most importantly, and I will be asking this Court, that if you allow the stay to continue, you specifically direct that Chevron is not to continue to take these documents that it already has and turn them over to the press and do other things with them. It should stay. The stay means the stay. And we're looking for a couple of weeks to be able to argue on the merits. If I may turn to the merits, because I think that while the Court has tried to do the right thing, it has committed two obvious errors of law, which, of course, are reviewed de novo by this Court, and three exercises of what I would suggest are abuse of discretion. The first error of law... On the merits, I'm not, unless my colleagues want to, I'm not sure that I need to get into the merits for today. I'm only concerned about it because I need to show you that I have a substantial prospect of winning on the merits. Now, I know it's a sliding scale. The greater my prejudice, which I suggest is terribly great if my clients are going to lose absolutely all their privileges now and into the future, may not require much demonstration with respect to prevailing as a matter of law. But the short answer is, and I won't elaborate all of them, the District Court failed to take cognizance of the distinction recognized by this Court, the First Circuit, the Second Circuit, that public disclosure of privileged information matters whether it is intrajudicial, in the proceeding, and affects the fairness of the determination of the truth process, or extrajudicial, like a press release or a movie. This was extrajudicial, and those courts, cited in my brief, uniformly hold that where it's an extrajudicial disclosure of privileged information, you have to operate with a scalpel and not a chainsaw, which is what the Court did by declaring subject matter waiver. You need to look at what was waived. You need to fairly decide the documents that therefore should also be waived, but everything does not automatically become waived. For example, I've said to you, my mission now is to provide advice on issues of international judgment enforcement. That's one of my responsibilities. I've just come into the case. Why should my advice memoranda, were they to appear in Mr. Donziger or Mr. Collins' file, to my clients, hired to be sure that a judgment with integrity is entered, be forfeited by the happenstance that there's this respectfully overly broad decision by the District Court in Philadelphia? The second piece of that error related is that in this Court's decision in Westinghouse versus the Republic of the Philippines, the Court said that there should be a careful analysis of balancing as to exactly what needs to be disclosed. This Court said, the District Court said, that doesn't have to happen here. I'm rejecting it. I'm not doing it at all because of the sort of gross nature of the waiver. We've searched for every case since this Court's decision in Westinghouse and could find no rule of the gross nature of the waiver sui generis decided by the District Court that excuses the District Court from performing the analysis that this Court requires under Westinghouse. By way of abuse of discretion, I'll simply touch on it. The subpoena should have been limited in scope. The Court said it would, and then in its opinion it didn't. It said, I'll only require everything having to do with the Ecuadorian litigation, nine years of work, not the New York litigation. But then it used the term related. Now understand the practicality here. Mr. Cohen, who has been counsel to the plaintiffs for a long time, but had his severance with the plaintiffs, an issue I don't need to go into, he's not opposing turning these documents over. What do you make of that? In other words, apparently nothing in those documents worry him. I guess nothing in those documents worry him. What I think it is, is the following. Mr. Donziger and Mr. Cohen have had a falling out. Mr. Cohen did not approve of Mr. Donziger's doing this film, maybe for very good reason. Mr. Cohen is interested in showing the world he had little to no part in it. So, he's interested in basically showing he's got clean skirts in the affair, and while he's doing the right thing by saying, let new counsel for the Lago Agria plaintiffs argue their privileges, he's doing nothing to defend their privileges. And the net effect of that is, when you look at the order that the district court entered that says related to, and when you figure out who's going to make the call as to what's turned over based on related to, there's going to be a very generous turnover of documents, I suggest to you virtually everything. The last abuse of discretion issue, and it is troubling to me, it's troubling to me. My partner argued this before the district court before Christmas, and asked for a brief period of time for a stay to take this matter to this court. He asked for a couple of weeks, denied a week, denied a day, denied a minute, denied. And the court was quite clear in what it then said. The court said in the transcript, I do not know whether an appeal of this order will be taken, and I'd like to do what I can to he then threatened that if we had the audacity to appeal, he would go to the question of crime fraud. And he concluded by saying if it is perceived as an attempt to chill an appeal, yes, that's exactly what I have in mind. Respectfully, this is a judge who felt very strongly about these issues, but it is not the province of a district judge to admit on the record that he's trying to chill a party's appellate. I thought that too, but then I thought, you know, what a court may do as a trial court, while I was a state trial judge, is that sometimes a judge will say, I'm not writing on that issue because it's not necessary to write on that issue in view of the disposition I'm making. But if there's an appeal, there's something else that I would have said that would support the result that I reached, and then I'll get involved in it. And then if he had maybe put it more diplomatic, it would have sounded better. Difference in degree, difference in kind. There's no doubt, Your Honor, that's right. It's perfectly appropriate to say, I don't need to reach this question now, but this wasn't said in that tone, and the transcript, even without the tone, speaks for itself. I want these documents turned over now. I want to discourage you from your appeal right. When you marry that up with the failure to do the things that I have just outlined, you become very concerned, bluntly, that justice was not done in this case in Philadelphia. Thank you very much for your time, Your Honor. Mr. Rivero first. Mastro. Sorry. I'm sorry. My fault. Thank you, Your Honor. It's a pleasure to appear before you again. Your Honor, let me come right to the heart of the matter, because why did this, as Your Honor put it, street smart district court judge find such a sweeping waiver? Because what happened with the filming of Crude, several hundred hours of filmmakers following around plaintiff's counsel, Stephen Donziger, who was the star of the movie, who solicited the film, who invited the filmmakers in. He was working for the Ida Cohn firm at the time and Joe Cohn on multiple hours of tape. And that may be an exceptionally good argument on the merits, but at this point, we're trying do we get to the merits? Because if we lift the stag, in effect, the case is moot. Well, Your Honor, that's... I'm glad you asked that, because this is like a replay of what just happened in the Second Circuit. It was Mr. Terrell against Mr. Mastro, and the Second Circuit rejected the stag outright. It praised Judge Kaplan for how he'd handled the case, and it said, as to Stephen Donziger, the ringleader here, who was working for the Cohn firm at the time, being paid by the Cohn firm, that he had a blanket waiver, and there was going to be no stag. November 24th, or when did it come out? Judge Kaplan's decisions were in the October and November time frame. The Second Circuit denied a stag when Judge Kaplan ruled at the end of November that there had been a blanket waiver by Mr. Donziger. Second Circuit denied a stag. The interim stag. Then we appeared before a full panel, and the panel denied the stag then. We had an expedited appeal on the merits, because Mr. Terrell and his colleagues argued at the time, even though we don't have a stag, and even though everything has been produced, you could still maybe subsequently order relief. If we do grant a stag here, and we expedite it like two weeks, two weeks, five days. Here's the problem, Your Honor. First of all, we don't come here on a clean slate. There have now been four circuits that have addressed exactly these same issues. In every one of those instances, the Second Circuit, multiple times, the D.C. Circuit, the Fifth Circuit, the Ninth Circuit, they rejected stags, they rejected their position on the merits, and two of them were lawyers. I'm confused about this. When you say the same issue, you're not defining that as meaning the movie issue. You mean other aspects. I am, yes, Your Honor. You could say we had the same issue. Correct, Your Honor. I am saying, Your Honor, that in those other circuits, it either involved an expert of theirs as to whom they claimed there was privilege, or it involved attorneys on the case. D.C. Circuit was Mr. Rye. Second Circuit was Mr. Donziger, and Mr. Donziger was found to have had a blanket waiver, and there was no stag put in place by any court. I suggest to Your Honor the following, because... Well, I don't think we can sit here and wipe our minds clean of the first appeal, if I can call it that. We were aware of what we saw there. I appreciate Your Honor bringing that up, because that was then one of the very first 1782s, when there were no crude outtakes, when there was no Donziger testimony and disclosure of his documents, when we had yet to establish that Stratis, plaintiff's experts, had ghostwritten the Cabrera Report. We filed in UBR. I think Judge Chesler got it absolutely right that when it came out in that proceeding, that the same expert was both the plaintiff's expert and working for the court-appointed expert at the same time, that that was a blanket waiver and crime fraud. There was a stay there, but that was then. This is now. We were in the dark then, because they fought so hard to keep us in the dark. Now the light has been shown on this massive fraud. We have the outtakes. If a stay with an expedited briefing schedule is granted, what is the harm? I'm going to explain it as clearly as I can, Your Honors, because it's not just that the Sword of Damocles is over the heads of the two individual Chevron attorneys. Even there, you have an indefinite postponement of a preliminary hearing that was initially to be held today, correct? Your Honors, Chevron now has the Sword of Damocles over its head. In Ecuador, the court there, in mid-December, December 17th, issued what's called the Autos. The Autos is a summoning of the parties that were going to go to final judgment now. It's your last chance to make your closing argument in writing, something that the parties are doing this very week. And that court, we moved to give us more time. The court denied that motion. But we're not responsible for you being in Ecuador. I mean, you could have been in the Southern District of New York, right? Oh, but Your Honor, that's not really... The point is, what's going on in Ecuador, how does that affect what we do here? Absolutely it affects it, Your Honor. How does it affect what we do here? Because that's why we want the discovery. We need it now. They're going to the final judgment stage in Ecuador, and that's what the court has told us. You don't have to take my word for it. Mr. Terrell's firm, and I think he said he was, you know, had just come into the case. They've been working on the case for months. But you've already got documents in the Second Circuit case, right? You got from Mr. Donziger? We got from Mr. Donziger, but here's the difference between Mr. Donziger and Mr. Cohn. Mr. Donziger is still a part of the cover-up and the fraud, fighting at every turn to try and prevent the truth from coming out. Mr. Cohn has said very openly, and we take him at his word, that he wants to tell what happened. He's, in fact, accused Mr. Donziger and the rest of the cases. But that's not his decision to make. Well, Your Honor, I would submit this to you. I would submit this to you, that in the case of, you know, Mr. Cohn, his attorneys have forthrightly said to Judge Du Bois that they don't disagree that there's been a crime-fraud here. They don't disagree that we should be entitled to all this discovery. They want to produce it. I agree with you it's not his decision alone, but I would say this to you. We are facing imminent judgment in Ecuador. Don't take my word for it. A memo they wrote in the late summer, their words, not my words, it's the Patton Boggs firm, describing what steps they're going to take next. They said that this autos order, this is how they described it, they said, quote, shortly before judgment, end quote, the Ecuadorian judge will issue an autos, and that that is the judge literally demanding the evidence be brought to him for final judgment. I notice that court is referred to as the Supreme Court. Is that in the sense that the trial-level court of the highest jurisdiction in other words, is there a court of appeals? There is, Your Honor, but in the same memo, Patton Boggs plotting its enforcement strategy, and this is the key. As Judge Kaplan and the Second Circuit have recognized, we're in a race. They're trying to slow down our discovery so we get the evidence, the BIT panel, and Ecuadorian court to get their judgment in place so that they can then try and enforce I thought you wanted this, I thought this issue was about getting the cone material for the criminal prosecution of Polaris and Vega. That's what this is all about. How does this affect Chevron? Because the judgment could literally be entered today. How does that affect the criminal proceeding? But Your Honor, it's not just about the criminal proceeding. They have an application, and Chevron has a 1782 application, and Judge Du Bois granted it as to both and found that both will be prejudiced if we don't get the discovery. How do Joe Cone's notes help you in the Chevron case? They absolutely do, Your Honor, for the reasons that Judge Greenberg pointed out. We're trying to show that these multi-billion dollar court expert findings, assessments, damage estimates, are bogus, they're part of a fraud, they were ghostwritten by the plaintiffs themselves, and we need to put that before the Ecuadorian court to try and prevent them from the counsel for Polaris and Vega were pointing to the criminal trial or the criminal preliminary hearing which was scheduled today. We both have an urgent need, and I have to say, Judge Kaplan recognized that both the individuals and Chevron have this urgent need because judgment could be entered against us at any point, and they will run around the world, literally Mr. Donzick's words, to wreak havoc on us by trying to enforce that judgment in Venezuela and Angola and Nigeria, all around the world. You know, you can understand, we're not familiar with Ecuadorian courts, but in the United States the suit always involves two aspects, the liability and the damages, and when you read this, I'm not sure what happened, has liability been established, or are we now down to just determining damage? No, Your Honor, the Ecuadorian court will issue, and now, having issued this autos, that they could, yes, they could, a judgment is going to occur, the judgment will establish both liability and damages. Once that judgment is entered, and the court, their words, by entering the autos, is saying that shortly before judgment, now's the time, we're going to have judgment now. That court could issue a judgment at any moment, and Your Honor asked the right question, which is, well, what happens when the trial court enters judgment? Is there an appellate process in Ecuador? And that court is the trial court. In connection with the... The answer is, yes, there is, but again, the Patton Boggs firm, in its own internal memo from the summer, tells us that that will not substantially delay enforcement, and indeed, it lays out a strategy for pre-judgment attachments around the world in venues outside the U.S. What's the status of the United... I never even heard of that law, to tell you the truth, until I read this case. I read the other case, the one you argued first. What's the status of that case, the arbitration? The arbitration is progressing, and we have applications... It means, Your Honor, it's progressed past the jurisdictional motion stage, and we're in the merits stage. We have an application, literally, for emergency relief there, that they shouldn't be permitted until that panel has had a chance to hear the case. Who are the arbitrators? Your Honor, there are three very distinguished... One former judge, two very famous lawyers in the international community. It's a very distinguished panel, and here is another thing that you need to know about that case. We have sought the provisional remedy that they shouldn't be... Ecuador should be told that they shouldn't be trying to The Ecuadorians are party to it, but the Ecuadorian plaintiffs are not a party to the arbitration proceeding. Correct, Your Honor, although the evidence is overwhelming of the collusion between the two in trying to, with the Republic of Ecuador's case, impose its own remediation obligations and identification obligations onto Chevron through the private plaintiffs. But, Your Honor, there, we seek the relief that the Republic of Ecuador should be, you know, required to take steps to delay attempts to enforce the court's judgment until the arbitration panel can be heard. Now, that arbitration panel, this is very important, because of what's happened, the autos issuing final judgment imminent, that arbitration panel, very distinguished, wrote to the judge in Ecuador a month ago and said, please tell us, give us some estimate of when you're going to respond. The judge has refused to respond. Nothing. None. Is there a new judge in Ecuador? There absolutely has been a new judge appointed, Your Honor. The last judge, there was a disqualification motion, and he had to, he was kicked off the case. Are the arbitrators, what country are they from? Your Honor, I can get to the specific countries. I know that one of them is from England. They're all renowned international... It's an international panel. De-arbitration under the UNSA trial rules, Your Honor, and one that's done by international treaty between the United States and Ecuador. But we need this evidence both there... Mr. Master, let me ask you this question. This sort of gets to the merits, but it's an issue that concerns me. The issue is the waiver of the attorney client privilege here by virtue of the outtakes from the crude documentary. Yes, Your Honor. And you talked about the Second Circuit's decision. The Second Circuit decision involved Donziger's notes, correct? Yes, Your Honor. How did the Second Circuit treat the decision of that circuit in the Kloss Fund Bulo case? Well, Your Honor... Because what I'm concerned about here is the breadth of the waiver. I'm pleased that Your Honor asked about the merits because it is an element of the stay. So let me address... It's an element of the stay. Because they have to show substantial likelihood on the merits. Now, Your Honor asks about how they dealt with the Von Bula case. In fact, the way that Judge Kaplan and the Second Circuit addressed it in Donziger's case, Donziger had permitted a waiver because of his delay tactics and not producing a privilege law. Judge Kaplan had found that he had substantially waived already, and then because he was supposed to produce forthwith, which in the Southern District requires a privilege law at the same time and didn't do that, that he had a blanket waiver. He had a substantial waiver already, and then he had a blanket. So the facts there were somewhat different. Correct. But let me explain Von Bulo and Westinghouse. Well, how would you distinguish Von Bulo if... Completely. Yes, I'm pleased Your Honor asked. Von Bulo is distinguishable for the following reason. What the Second Circuit said there, and what this circuit recognized in Ambrose, recognized in Teleglobe, is that there's nothing unusual about an extrajudicial waiver. When that waiver, though, is intentional and causes prejudice or unfairness or was done to advantage one's litigation position so that you are using the privilege invocations as both a sword and a shield, under those circumstances that the only fair thing to do is to recognize that there's been a broader waiver. Let me give you the exact language from Von Bulo. Quote, the extrajudicial disclosure of an attorney-client conversation, one not subsequently used by the client to his adversary's prejudice, does not waive privilege more broadly. In Von Bulo, the issue was someone after trial, Von Bulo, he'd already won the trial. He clearly wasn't allowing his lawyer to put those things in the book to try and gain any kind of litigation advantage. And then subsequently Von Bulo got sued by family members, including his wife, over the torts that had been committed. She was in a coma at the time. So the court concluded a blanket waiver under those circumstances would have been unfair. He wasn't doing it. He wasn't waiving for some kind of litigation advantage. Here, Judge Du Bois found exactly right, and it's an abuse of discretion standard. He said this was done for tactical litigation reasons. It was a concerted public relations strategy to try and force Chevron to settle or to influence the outcome of the litigation. Intentional, his words, and this is what Judge Du Bois held, absolutely consistent with Von Bulo and what this court said in Westinghouse, that unless the partial waiver would be unfair to the party's adversary. That's exactly what Judge Du Bois found. It would be unfair to us because of their intentional waiver to try to influence the outcome of the case and to force Chevron to settle through a film that was going to give a one-sided version that didn't reveal the Cabrera fraud, that didn't reveal all the other frauds that have gone on here and the threats and intimidations of judges, but it was designed to prejudice us in the process, to force us to settle, that it's unfair for them to say, I'm going to allow filmmakers to film me for hundreds of hours. I'm going to solicit the film and have them do that. The most intimate strategy sessions about legal strategy, about settlement strategy, about their experts and what happened with Cabrera, and to not say that that is a blanket waiver. Judge Du Bois had it exactly right when he wrote, this is a truly exceptional scope of waiver. Quote, given that these disclosures were intentional and covered the entire scope of the ongoing Lago-Avio litigation. Did he look at all the outtakes? He had dozens of outtakes with him, Your Honor. He didn't look at all 500 hours. Okay. How many hours did he look at? Well, he looked at dozens of outtakes. How many hours did he look at? There were several hours of outtakes. How many hours did you estimate he looked at? I would be estimating, Your Honor. I mean, I would be guessing, but it's more than an hour. It's probably less than 10. It was the highlights. It was the highlights, but there were dozens of 500 hours. And, Your Honor, those outtakes showed private meetings in Mr. Cohn's office where they were discussing... Some of them were in Mr. Cohn's office. But, Your Honor, it's not limited to what was in Mr. Cohn's office. Mr. Donziger was on the vast majority of the outtakes, and in the vast majority of the film, and he was literally working for and being paid by the Cohn law firm during this period of time. So, what Mr. Donziger said in the outtakes, they're all part of the body of deciding whether there was a waiver. And, Your Honor, the things that are on those outtakes, the dozens of outtakes that Judge Du Bois saw and spent the time to review and gave each side hours of argument, on those outtakes, Donziger saying that, you know, maybe a judge won't be killed, but if he thinks he will, that's good. Threatening to close down the courthouse, shut down any preservation that the judge has viewed the documentary? Apparently not, Your Honor, but they haven't influenced the judge. Well, Your Honor, I think the evidence that they've influenced the judges on the case now is they demanded that he go to judgment stage and issue the outtos. Two days later, he issues the outtos. This is mid-December, then he rejects our motion and literally judgment could be entered any day now. And, Your Honor, on those outtakes... That's your argument. But, Your Honor, that's not a question of argument. I let them speak for themselves. I don't ask you to trust me. I use his words. This is a case where the other side in the race wants to delay us on discovery at every phase and wants to speed up the judgment. Have the Donziger documents that have been given to you to date been used in connection with any aspect of the Ecuadorian proceedings? Absolutely, Your Honor, and in the bid arbitration. And we believe that what Mr. Cohn... But we have also explained... As has Judge Kaplan... In connection with the film crew, aren't the Donziger outtakes far more important to you than anything else? Your Honor, they're extraordinarily important because they reveal the wholesale waiver and fraud that has gone on here. And that's what every court that has viewed them has found... It appears that they're the big enchiladas, so why is it that you want us to decide this minute in effect the merits of this case relating to Mr. Cohn? Actually, Your Honor, the crude outtakes are extremely important evidence that should convince you that they have no... And you may be right, but why do you want us to decide in effect... If we look for stay, as I said before, in effect what it's doing is it's mooting the case, isn't it? Your Honor, you are rewarding an intentional course of delay... I'm not trying to put any value judgment on it. If we look for stay, is it mooting the appeal? Your Honor, they told the Second Circuit on Donziger, even after they lost a stay motion, both interim and full panel, that it didn't moot their appeal, that this court could expedite the appeal, and if the court found otherwise, then you could issue appropriate orders that wherever we'd use the documents, we should try and retrieve them and give them back. What would you expect the documents to do in the best... really what you wanted? That they would be the smoking gun and you could present these to the Ecuadorian court? Yes, Your Honor. And show the Ecuadorian court, hey, this is a whole thing as a... And to the BIT panel, Your Honor, where we're trying to get orders against the Republic of Ecuador, slowing the enforcement train once a judgment is entered, so we have an opportunity to challenge it. But can you use Section 1782 to get discovery for the BIT panel? Absolutely, Your Honor. Yes, and that's what every court in this country has found that's been asked to address that issue, including the Second Circuit. Because the BIT panel is an international treaty arbitration under UNCTRA rules by treaty compact between the U.S. and Ecuador. They didn't raise it. Well, they've lost it so often. Collateral estoppel eventually comes into play. But if I can just respond to Your Honor's question. Yes, the crude outtakes are extremely valuable. Yes, the discovery we've gotten from Mr. Donziger has been extremely valuable, though he's fighting tooth and nail not to admit it in his deposition. But Mr. Cohen, and I have to make this distinction, Mr. Donziger hasn't produced everything. Mr. Cohen has already, before the stay was put in place, and we haven't used his documents anywhere, Your Honor, no matter what Mr. Terrell said. Mr. Cohen's documents, once the stay was entered, we have not submitted them anywhere. We're waiting for this court. But Mr. Donziger, in fact, even though he's been on the case for 70 years, produced fewer documents, even with his complete privilege. But if the Cohen documents are as important as you say they are, and we're willing to expedite the matter beyond what we normally do, and expedite it significantly, why is it that you don't even want us to do that? Your Honor, it's for the simple reason that literally any day, the court in Ecuador could enter a judgment. And then we will have lost that opportunity to have that evidence when Mr. Cohen says, and he said it in correspondence with Mr. Donziger that Donziger had to produce, that there's a fraud going on here, and I want to tell my side. I don't read that in the document you submitted yesterday. The court allowed time for additional briefs. And this case has gone on for nine years. You're trying to make us believe that the decision's going to be made overnight, when the court clearly said in that document that they were allowing for additional briefing. I'm sorry, which one of the documents we got yesterday from the clerk, it was submitted by, I believe it was submitted on December 29th. Okay, and I'm not sure which... Well, I'll find it here as you're talking. I appreciate it, Your Honor. I appreciate it, Your Honor. Is there anything else you want to add before we hear from anyone else? Yeah, I just, I really wanted to explain, Your Honor, that as Judge Kaplan, who's lived with this case the longest, he did both the crude outtakes and Donzier, and the Second Circuit, which has reviewed both, have recognized this is not a situation where the delay tactics on the discovery, the appeals, the stays, the limited productions have been done for any other reason than tactical to prevent the information from coming out before Ecuador enters a judgment. They've now succeeded in getting us to the judgment stage in Ecuador, and that could happen any day. Okay, here it is, since you're saying you submitted it on December 30th. Yes, Your Honor. And the document with the translation from the Ecuadorian court, which says that it is what you say it is, but the last sentence says the parties may submit their legal briefs in defense of their interests. Oh, yes, that's exactly right, Your Honor. That doesn't sound to me like something's going to happen overnight. Your Honor, I mentioned that. How do you submit briefs quickly? Because we've gotten a lot quickly from all of you. Your Honor, I mentioned that earlier. When the court in Ecuador denied last week our motion to revoke that order, we literally have had a week to put in our final papers. They're called the Aligato, and we are putting that in if not today or tomorrow. So that's happening. You only have a matter of days. Again, don't take my word for it. In the Patten Boggs memo from the summer, they say you have a short time to put in that final brief. We're putting it in today or tomorrow, and that's the maximum time you have. You have literally a week. I'll take your word for it. And, Your Honor, I just want to be crystal clear about it because Judge Kaplan and the Second Circuit denied stays repeatedly because, as they found, and we put the documents before Judge Du Bois, Exhibits 87 through 89. The pattern of appealing, seeking stays, giving only a little bit of a discovery so we had to go back in to compel, this is what's happening in Donziger's case. That pattern has been one orchestrated by the plaintiffs. Again, counsel, don't take it from me. Take it from their own words. I urge you to read Exhibits 87 and 89 where Mr. Terrell's colleague specifically wrote, in the context of one of these earlier 1782s, this is what he wrote in May 2010, months ago. Mr. Terrell didn't just come on the case. His firm has been on it for months. Quote, what about the following as a move for stay? If we win, great. If we lose, we produce whatever we want. Narrow read. Gibson done complains. And then we move for clarification. If we lose again, we think about another appeal. To which Mr. Donziger responds, I like the approach. I like this approach. That's what they've been doing with every court. And in the Second Circuit and before Judge Kaplan, he said enough. He said their arguments were not entirely in good faith. Not just Donziger, the plaintiffs' lawyers. The Second Circuit said, no stay. They've lived with this case. The gun is to our head. We're in the last lap. The Ecuadorian court can enter a judgment any day and it's a potential $113 billion judgment. And then they're going to run around the world to enforce it. We need the discovery. Why don't we hear from one of the other counsel? Thank you very much. I really, really appreciate it. May it please the court. I'm Alan Weingrath from Covington and Broy, and I represent Ricardo Vega. I want to get right to the point that I think was on the minds of all three of your honors based on the questions I've heard, which is the timing issue, which goes to the injury to Mr. Vega if the stay is continued, one of the four factors under the four-factor stay test. The preliminary hearing in Ecuador in the criminal case has already been scheduled twice. And the latest postponement, as I think we made clear in our submissions to this court, was based on what the prosecutor down there said was a scheduling conflict between this case, which was scheduled for today, and another case in which he had to appear in court on Friday. So as far as we know, and having consulted with our Ecuadorian counsel, the preliminary hearing can be rescheduled at any time. There is no minimum prior notice period required under the law, as there was for the initial scheduling of the hearing. And given the reason for the requested postponement, one would think that the postponement would be temporary. I don't know when, your honors, but they're certainly not putting it past the realm of reality that in a few days from now there'll be a notice, say next Monday, saying we're going to have the hearing next Thursday or Friday, the 13th or the 14th, so that recognizing your honor's concern about the truncating of the discussion of the merits into the state litigation, if that hearing is rescheduled and that type of time frame or anything close to it, even an expedited briefing schedule of the type that your honor Judge Ambrose has suggested, which would put even expedited briefing into February to be followed by argument and then whatever time would be required for this court to make a decision, won't be quick enough for the applicants to use whatever evidence, and it certainly appears that it's going to be very significant. Obviously we're not familiar with Ecuadorian procedures, but in this country, defendants don't normally proffer any evidence at a preliminary hearing. As I understand what was scheduled for today, it was that kind of a preliminary forum. How does the Ecuadorian process differ from ours, that your clients wouldn't be able to use this information from Mr. Cohn's files at a later time at the case in chief? Well, we're not saying that it could not be used at a trial. What we are saying, and this is unrebutted through the Declaration of the Ecuadorian Council, which was tendered to the District Court in this proceeding, the preliminary hearing is the only opportunity that Mr. Vega and Mr. Payadas will have before trial to present either legal arguments or evidentiary arguments in support of the dismissal of the charges, and it is certainly our intention to use the evidence that we've gained, both independent of the 1782 process, as well as through the 1782 discovery we've achieved. I understand that the statement that this will be the only opportunity to use it before trial is correct, and you could make that statement here in the United States, but it might not be the time at which the tribunal in Ecuador is really going to consider that evidence. Well, two answers to that, Judge Fisher. One is, as a matter of law, again, as explained by the Ecuadorian Council, we certainly have the right to present that type of information here. Now, you think that the record shared that before Judge Du Bois? Absolutely. It's in the Declaration of Jaime de Neviso. And secondly, we intend to do that. Part of the evidence that we intend to submit, for example, has to do with how the prosecution of this case, having been rejected by several prosecutors in the years prior to the Cabrera report surfacing and being filed, then got re-initiated a day after the Cabrera report was finalized. And we definitely intend to introduce evidence to the court that this Cabrera report was a fraud. And it was secretly ghostwritten by the plaintiff's lawyers. The charges against the two defendants in Ecuador, the two lawyers specifically, what are the charges? The essential charge, to use a United States analogy, is akin to a violation of 18 U.S.C. 1001, essentially making a false statement in a public document. We're not conceding that those elements were met, obviously. But that's the nature of the charge. And they're both residents of Ecuador? No, they're not. How does the court have them before? Well, they were charged, allegedly, based on conduct that occurred while they were 15 or so years ago in Ecuador. They don't reside there now. Are they extradited? They have not yet been extradited. I'm trying to understand this. So they're not in Ecuador so that it would be very difficult to try them in their absence. Yes. Someday, if somebody was really interested, try to get extradition and all that. Agreed. Where are they from? My client is originally from Brazil. He's a naturalized citizen of the United States. Mr. Payadas is a citizen of Ecuador. No, they're not. They're not presently in Ecuador. But in terms of the focus of why we want the information from Mr. Koh now, it does relate to the preliminary hearing, which will go forward in Ecuador, whether they are present for that hearing or not. So that's our timing issue. And Ecuadorian courts going to allow them to present evidence and defend themselves without appearing? Yes, they will at the preliminary hearing. And that is documented in Mr. Donoso's affidavit, unrebutted in the court below. Yes, they will. And as for the substance, I won't belabor what Mr. Masters said. Mr. Koh has a distinct and unique role in this entire litigation that sets him apart from our perspective, from some of the consultants and others who have been the subject of 1782 actions. And he is ready to reveal what he knows. And based on what we know from other proceedings, he has evidence that goes to the arguments that we intend to make in defending Mr. Vega on these criminal charges, both relating to the fraudulent Cabrera report, as well as, frankly, the entire overarching picture of this case, which is the criminal prosecution being instigated by the Lago Agrio plaintiffs. And the record is complete with the evidence of that. They are  this sham prosecution of Mr. Vega and Mr. Payadas in order to secure a large settlement from Chevron. You can't reveal what he knows, and he doesn't want to take the chance, I gather, without the cover of something from the court. In other words, that's why he's in a unique position. He's ready to reveal, but he needs court cover. Well, I mean, he needs the approval of a court, either based on a waiver theory as adopted by the district court, based on the crime fraud exception, which is an alternative basis that the district court certainly hints it at, and several of the courts have adopted. But yes, Judge Greenberg, I think that's correct. My point, though, really deals with the Public Interest Act. And if you're weighing all four of the factors under this court's precedent, I think I want to spend a minute talking about that one. They are the ones who procured this prosecution, which is now hanging over our client's head. The district court, in its supplemental memo, denying the request for a stay, said that. It specifically said, and it recognized the evidence that we submitted, that one of the grounds for denying the stay was they were the ones who put us in this position. We did not choose to be in Ecuador. Okay? I think Chevron has answered the question of how they ended up there in the civil litigation, but we didn't choose to be there. We're hostages to the battle between these folks here and Chevron over here. In what other locations in the United States are you currently trying to get documents, and of those, how many of them are you currently getting documents? Currently, the only other pending proceeding where we're getting information is in the case of Mr. Donziger. Otherwise, the other 1782 proceedings that we have filed, we've prevailed in every one of them, we've gotten the depositions in every one of them, and we've gotten the documents in every one of them, say, for one consultant in one proceeding, and it's a small number of documents. So this is the only one that we're involved in that is still actively being litigated. Anyone else that we want to hear from? Anything else that you have additional to add? Your Honor, if I may briefly address Mr. Perez's circumstance, which is slightly different, and attempt to just answer questions. I know the Court has been very generous in time. Andres Rivero Andres Rivero for Rodrigo Perez Perez, and I want to make clear I represent an individual Mr. Perez is 74 years old, a native of Ecuador. He's a lawyer in Ecuador for 40 plus years with a clean record as an attorney. All that time, a practicing lawyer. In part of his career, he represented a predecessor to Chavez. In the course of his work, he signed a release. And because he signed that release, in our view, and we think the evidence that we've been able to develop in these 1782s has shown that sculptatory evidence that these plaintiffs engendered a claim, a criminal case, through the government against my client, in order to advance their civil case. That's my theory. I want you to consider me a... I'm assisting an Ecuadorian criminal defense lawyer, but I am in this case a criminal defense lawyer. And Judge Fischer, there I want to address very specifically the question that you asked. What are the consequences of a preliminary hearing? Your Honor, I was a federal prosecutor, and I understand within our system the significance, and preliminary hearings almost don't exist. Non-indictment and that kind of thing, etc. The difference in the system we're talking about in Ecuador, and the charges, Judge Greenberg, are Articles 338 and 339 of the Ecuadorian Code, exactly as Mr. Vinegret says, most comparable to our 18 U.S.C. 1001. The difference, Judge, is on a preliminary hearing in Ecuador, and this is a verdict to docket entry number one, the declaration of my colleague, Paul Bands, who attaches the uncontroverted testimony of our Ecuadorian criminal counsel, Jaime Donoso, in a preliminary hearing in Ecuador. We can present documentary evidence to disprove the allegations, and the judge will consider the documentary evidence in making a very clear determination, which is whether the purpose of the preliminary hearing is whether the case will proceed to trial, or whether it will be dismissed. Sufficiency of evidence and whether the evidence goes towards the elements of this offense are absolutely part of the consideration of the preliminary hearing, Judge. And that is uncontroversial. Do you know whether the standard for holding the case for court is the same as the Europe-Ramaphesh case? I can't know. I'm told not, Judge, but you there have to be careful because I'm not an expert in Ecuadorian law, but I would say it's more akin to sufficiency, not prima facie. Although I think the prima facie analysis comes into, did you meet an element? But I think it's more liberal than our standard, which is a very minimal standard you have to meet, Judge, the consequence. In addition, I understand why the court's asking about standard. We have a chance, Judge. I think the practical thing is, especially with this extraordinarily powerful exculpatory evidence, Judge, I've been doing this for 24 years, including five years as a federal prosecutor. I have never seen lawyers conduct themselves in the way that these gentlemen, including with all respect, I know Mr. Cohn's known here in Philadelphia. I'm not from here, and I'll be careful. But for a lawyer to say in an outtake, and I think Judge Du Bois saw this, as to material put in front of the Attorney General of Ecuador, well, if the time comes, we could make this go away. Judge, I've never seen that kind of stuff, and it's recorded. But Judge, what's the consequence? I don't want to lose my thread. If we don't prevail at a plenary hearing, that plenary hearing happens. Not only do we go to trial, I understand, or you can defend a trial just like you would in this country. Judge, extradition proceedings can't proceed from there immediately. And that goes to what Judge Greenberg was asking about. Yes, my client is in Miami, Your Honor, and I say this with unfortunate personal knowledge. He is exiled. I'm Cuban-American. He's what? He is in practical fact exiled from his country. I'm Cuban-American and I say this with great personal understanding. He cannot return to his country without risk of his liberty because of the conduct of the folks represented by these counts. Now, but my point is, if we were to lose at that preliminary hearing, and this is why I just want to say this is very important, that judge can enter an order starting extradition proceedings, which we'd have to defend in this country. We think we have good arguments. All that exists, Judge. I represent an individual whose liberty is at stake and he's 73 years old. If the preliminary hearing is delayed indefinitely, I guess what we were told is it can be restarted on no notice. That doesn't make much sense. It has to be some notice. No, the answer is no notice, Judge. But Judge Greenberg said... But then he won't be there. Well, no. The preliminary hearing... Or his counsel won't be there or somebody won't be there to hear what's going on at the preliminary hearing if there's no notice. No, of course. I'm exaggerating. Of course, there has to be a notice that permits defense counsel to appear a day, two days, whatever time. Going to that subject, Judge Fischer, I hope I addressed there are important consequences. Judge Ambrose, yes, the preliminary hearing can proceed in absentia. The preliminary hearing can proceed in absentia. The amount of notice is different immediately after the indictment. After the indictment, under the Ecuadorian Code, this is in the declaration... It's like the United States. There's a preliminary hearing and it goes to a grand jury? No, Your Honor, it's different. Who returns the indictment? It's completely different. It's the continental system, Judge. You have prosecutors and, in fact, it's a specific... Exactly. It's like a preliminary hearing on information. That's what I would most compare it to. That's exactly right. But it's not precisely like our system, but it is a prosecutor's investigation that leads to a dictamen, which is close to an information, is how I would describe it. And then the point is on the timing. In the first instance, the judge, within X period of time, has to give an order within X period of time has to give an order that sets the is a regime of times for the initial setting. On the normal case, our counsel tells us, this is not in the record, so I would just say my counsel tells me, like happened, this was continued once before from October or November to January 5th, they set the date in the order. This is a very unusual circumstance where there is an indefinite continuance, not far in the future, Judge Greenberg, but as you asked before, but simply for an unknown date, whether that is a day, a week, a month, a year, a decade, I can't tell you. I don't want to prolong because you all have listened to me. If ultimately there's a trial in the continent now, I think occasionally they now have jury trials. Is there a jury trial? No, Judge. In the Latin American systems, which are also from the Atlantic Code, with the exception of, as I understand it, Brazil and a couple of other, Brazil in capital cases and some other countries, Ecuador is moving towards an American system, but has not adopted juries. I do a fair amount of work in cases related to Ecuador. Judge Ambrose, the question is, I know the core question is, stay versus expedited appeal. I really return to the reason I'm making this, perhaps not long and the argument is, as a criminal defense lawyer for someone who could face extradition from a haven, it is a risk. What are the chances of his being extradited? Your Honor, I wouldn't want to run that risk. Let me tell you my experience as an extraditionist, you have a form of a hearing at state. Once it gets to the Office of International Affairs, and Judge, I've done this on the prosecution side and on the defense side, you don't have a right to be heard at the Office of International Affairs in the Department of Justice. And once it gets to a U.S. Attorney's Office, even if I'm a respected former prosecutor in the Southern District of Florida, I cannot go to the U.S. Attorney's Office. They won't have discretion. And I can go to a magistrate judge in Miami and ask for a bond, but I think you all know that's extremely difficult and the defense is on an extradition at that point before neutral magistrates become technical, have they met the requirements and the rest. I have extraordinary evidence and I believe that Mr. Cohn, he says he wants to give it on a ruling from the court, has more of it. And we need it to defend. Very briefly in closing, my point is simply, Judge, you can understand from my perspective why it is an extraordinary risk. I understand the courts as judges, how you need to try to organize this, and I respect that and I'm running uphill in some senses because you've indicated as the timing and the rest. But I am very sincerely asking the court does not wish to lift the stay, and I am asking urgently to lift the stay. Even the timing, I can add two weeks, two weeks and five days, and the time this court will take to rule, something could happen. I know we could run back, but there is no defined time. What you're saying is if you get these documents, you can present them to the Ecuadorian court and you believe that this might assist in an argument that the case should not continue in Ecuador. That is correct, but when a dismissal at this stage, that is correct, Judge. You had the feeling of, well, maybe this comment ought to be left unsaid. Judge, I hope my telepathy I hope my telepathy is not working, but I have certain fears. Is there anything else you wish to add? Briefly only, Judge, that I want the court to bear in mind that Judge Kaplan, Judge Du Bois, the Second Circuit, and as recently as yesterday, the Special Master had asked these plaintiffs to stop their proceedings as to Chevron, and also as to us, and with regard to Chevron, they have never they have never been willing to stop anything to allow any court to do rational consideration. As I know, is your preference of course you're going to consider rational, the judicious time, taking the time to do it. They have never been willing. In fact, they asked for expedition after such request as to Chevron. As to us, very briefly, this was asked by many courts of these plaintiffs and only at the 11th hour did they go through this supposed process that the Attorney General has to talk to the Prosecutor General, and then on December 29th, they come up with the excuse that they suddenly realized they have a trial on January 7th. They have not made it easy for us or for you to do this in a orderly way, and I ask you to take that into account when you consider I understand these principles of judicial decision making, but they I think are on their own petard at this point, and I ask the Court to lift this section. Thank you. Is there anyone else? Mr. Terrell, we'll come back to you then. Thank you, Your Honor. I'll be brief, and we very much appreciate all the time you've given to this. I will touch on only a couple of points. First, to answer Judge Fischer's question about Von Buehle, those issues were never before any other courts. The decision in New York was based on a New York local court rule and a failure to timely submit a privilege log. That was the basis of the waiver, not the issue here. With respect to the D.C. Circuit's decision, it also had to do with a privilege log. This Court is going to be making the first decision with respect to Von Buehle or Westinghouse. Let me go to the issue that's at the core of this, I hope. What we've got is balancing certainty against uncertainty with substantial risk on both sides. The certainty is if you release this stay, Chevron will take all of these documents. I frankly chuckled when I listened to Mr. Mastro read my memos. He makes my point. He'll release all of these documents to the press and use them immediately. Will it be moot? You've asked the question. It won't be moot under the Supreme Court's standard. The Supreme Court says maybe you can fashion a remedy that will try to fix it, but 90% of the damage will be done. I can't imagine what Chevron could gain by releasing the documents. They make interesting reading to anybody who wants to read that, but what advantage it would gain in terms of the Ecuadorian litigation by releasing the documents to the American press. I just can't imagine how well it would match. Chevron has released everything to the American press so far. Its sophisticated public relations people have engendered stories, because what's really at stake? They're afraid that judgment will enter in Ecuador, that their predecessor Texaco destroyed an area of the Ecuadorian Amazon the size of Rhode Island, and they don't want that judgment enforceable in the United States. But why would releasing the documents to American newspapers have... I remember years ago I once had a case, I was assistant attorney general, somebody said to the television station, if you don't come on you'll have problems because the side against the state is coming on. I said, if the judge decides it on the basis of television, I'm out of luck, but I don't think he will. I mean, why does it have to do with anything? Chevron believes, respectfully, or they wouldn't be doing it consistently, that by claiming fraud, crime, and other things, they are so casting aspersions on the integrity of this case, and on the integrity of the Ecuadorian courts, that no United States enforcement court will enforce that Ecuadorian... You know, I'll tell you something, we could go out on Market Street, and I could stop a thousand people before I found anybody to do anything about the whole thing. That's the truth. I remember, because I've learned that about litigation, sometimes a criminal defendant makes the whole world looking at him, and no one even knows about the case. I can't disagree with you. If I had, if I weren't in this case, I wouldn't know a thing about it. The whole thing. And you'd be happy. Yeah, now I know 20. My wife says that I've reached an age where I don't remember tomorrow what I did yesterday, and so perhaps that's... Let me just finish the single thought. Well, I never knew what to start with, and I know what to start with. The certainty is that we will lose our privileges, and the documents will be circulated. The uncertainty, and speculation at this point, and what drove the other courts, and doesn't exist now, is that whatever it means, the January 5 date is off indefinitely.